UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NORMAN BLAGMAN, individually and on behalf
of all others similarly situated,

                             Plaintiff,

    -against-

APPLE INC., AMAZON.COM, INC., GOOGLE INC.,
MICROSOFT CORPORATION, EMUSIC.COM INC.,
THE ORCHARD ENTERPRISES, INC.,
ORCHARD ENTERPRISES NY, INC.,
and John Does 1-10, persons and entities whose identities
are unknown to Plaintiff but who have performed
and participated in the unlawful acts alleged herein,

                          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Docket No. 12 CIV 5453 (JGK)

**FIRST AMENDED CLASS
ACTION COMPLAINT AND
DEMAND FOR JURY TRIAL**



RECEIVED
OCT 12 2012
U.S.D.C. S.D. N.Y.

> If copyright dies, if patents die, if the protection of intellectual property is eroded, then people will stop investing. That hurts everyone. People need to have the incentive so that if they invest and succeed, they can make a fair profit. But on another level entirely, it's just wrong to steal. Or let's put it this way: It is corrosive to one's character to steal. We want to provide a legal alternative.

                       Steve Jobs, *Rolling Stone* interview, December, 2003

### Class Action Complaint

Plaintiff, individually and on behalf of all others similarly situated, hereby brings this Class Action Complaint and states as follows:

### Introduction

1.    This case arises from the failure of Defendants Apple, Amazon, Google, EMusic and Microsoft (collectively "the Retailer Defendants"), that together sell almost all the downloaded music in the United States, to ensure that the music they sell is properly licensed. Instead, the Retailer Defendants accept and sell unlicensed music from Defendants The Orchard

2.      Plaintiff, individually and on behalf of all similarly situated persons and entities, seeks relief from Defendants for the unlawful reproduction, distribution, and sale of copyrighted musical works by Defendants.

3.      Defendants Apple, Amazon, Google, Microsoft, and EMusic (the "Retailer Defendants"), who own and operate the largest digital music retail stores in the world – iTunes, Amazon MP3, Google Play, Zune Marketplace, and EMusic – are required, whether under Section 115 of the Copyright Act or by the other means outlined above, to obtain a mechanical license before reproducing and distributing copyrighted musical compositions.

4.      Defendant Orchard and other digital music aggregators, who act as the middlemen between the Retailer Defendants and the content providers, are required, whether under Section 115 of the Copyright Act or by the other means outlined herein, to obtain a mechanical license before reproducing and distributing copyrighted musical compositions.

5.      None of the Defendants, however, are meeting their statutory obligation to obtain mechanical licenses for all of the digital musical compositions they reproduce, distribute, and sell online.  Nor have they confirmed that all persons or entities who upload digital recordings have obtained the required mechanical licenses for the musical compositions embodied in those recordings.

6.      Instead, all of the Defendants are unlawfully copying and distributing the Plaintiff's copyrighted musical works (and the musical works of thousands of others) and profiting greatly from their illegal activities, all without Plaintiff's authorization or permission.

7.      Defendants willfully ignore their statutory obligations to obtain a license before reproducing and distributing copyrighted musical compositions.  As a result, Defendants have engaged in a massive and systematic course of infringing conduct which, although quite lucrative

2

for the Defendants, infringes on Plaintiff's copyrights and deprives Plaintiff, and thousands of other songwriters and publishers, of their rightful share of the proceeds from the sale of their music.

8.      Defendants' conduct constitutes willful copyright infringement in violation of the United States Copyright Act [17 U.S.C. §§ 101, et seq.] (the "Copyright Act").  Plaintiff seeks an order enjoining further infringement by Defendants together with statutory damages and attorneys' fees.

**Jurisdiction and Venue**

9.      The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1338(a) because this is an action arising under the Copyright Act of 1976, 17 U.S.C. § 101 et seq.

10.      This Court has personal jurisdiction over Defendants because Defendants do systematic and continuous business and/or have a place of business in this Judicial District.

11.      Venue is proper in this District pursuant to 28 U.S.C 1391(b), 1391(c) and 1400(a) because Defendants are subject to personal jurisdiction in this Judicial District and have committed unlawful acts of infringement in this Judicial District.  In addition, at least one of the Defendants has its principal place of business in this Judicial District.

**Norman Blagman**

12.      Norman Blagman ("Blagman") is a resident of the State of New Jersey.

13.      Blagman has been a successful songwriter since the 1950's.  Elvis Presley recorded two of his songs, *Put The Blame On Me* and *Give Me The Right*.  Blagman composed the song *Love Power*, which was used in the movie "The Producers" and co-wrote the music and

co-produced two albums for MAD Magazine: MAD "Twists" Rock 'N' Roll and Fink Along with MAD.

### Defendants

14.     Apple, Inc. ("Apple") is a California corporation with a principal place of business in Cupertino, California.  Apple owns and operates The iTunes Store ("iTunes"), a software-based online digital media store that is the most popular music vendor in the world, currently offering over 28 million songs.

15.     Amazon.com, Inc. ("Amazon") is a Delaware corporation with its principal place of business in Seattle, Washington.  Amazon owns and operates Amazon MP3, an online music store with a catalog of over 20 million songs.

16.     Google Inc. ("Google") is a Delaware corporation with its principal place of business in Mountain View, California.  Google owns and operates Google Play, a digital-distribution multimedia-content service that includes an online store for music.

17.     Microsoft Corporation ("Microsoft") is a Washington corporation with its principal place of business at One Microsoft Way, Redmond, Washington.  Microsoft has owned and operated several online digital music services, including Zune and X-box Music.

18.     EMusic.com Inc. ("EMusic") is a Delaware corporation with a principal place of business in New York, New York.

19.     The Orchard Enterprises, Inc. is a Delaware corporation with principal offices located at 23 East 4th Street, 3rd Floor, New York, NY 10003.

20.     Orchard Enterprises NY, Inc. is a New York corporation with principal offices located at 23 East 4th Street, 3rd Floor, New York, NY 10003.

21.     Together, The Orchard Enterprises, Inc. and Orchard Enterprises NY, Inc. (collectively, "Orchard") engage in the world-wide distribution of digital music through internet based retailers such as iTunes, Amazon MP3, Google Play, Zune Marketplace and EMusic.  One of the Orchard entities is the corporate parent of the other.

22.     Upon information and belief, Plaintiff alleges that John Does 1-10, directly or indirectly, jointly or severally, willfully undertook, performed and participated in the unlawful acts alleged herein.  Their identity is not known to Plaintiff at this time.

### The Subject Compositions

23.     Plaintiff is a legal and/or beneficial owner of numerous original copyrighted musical compositions which have been copied, publicly distributed, sold, and performed by the defendants in violation of the Copyright Act, including *The Prowl*, *Jazz is His Old Lady and My Old Man*, and *It'll Never Be Over For Me* (collectively, the "Subject Compositions").

### *The Prowl*

24.     Plaintiff wrote the music for *The Prowl* and registered the copyright for the composition on or about April 18, 1966 under Copyright Registration No. EU0000936529.

25.     Plaintiff registered the copyright for *The Prowl* using his trade name Sinolouge Music ("Sinolouge") under which he conducted certain music business.  Sinologue was never formed as a corporation or any other type of legal entity and Plaintiff was the sole owner of Sinolouge.

26.     Plaintiff renewed the copyright registration for *The Prowl* on or about January 3, 1994.

27.     Copies of the copyright registration and renewal certificates for *The Prowl* are annexed as Exhibit A.

28.     Plaintiff is the sole legal and beneficial owner of the copyrighted musical composition *The Prowl*.

### Jazz Is His Old Lady And My Old Man

29.     In or around 1977, Plaintiff collaborated with lyricist Gianni Bross ("Bross") on the musical composition *Jazz Is His Old Lady And My Old Man*.  Plaintiff wrote the music and Bross wrote the lyrics.

30.     Plaintiff registered the copyright for *Jazz Is His Old Lady And My Old Man* on or about April 1, 1977 under Copyright Registration No. EU0000770965.

31.     Plaintiff renewed the copyright registration for *Jazz Is His Old Lady And My Old Man* effective January 4, 2005.

32.     Copies of the copyright certificate and renewal certificate for *Jazz Is His Old Lady And My Old Man* are annexed as Exhibit B.

33.     Plaintiff and Bross are the sole legal and beneficial owners of the copyrighted musical composition *Jazz Is His Old Lady And My Old Man*.

### It'll Never Be Over For Me

34.     In or around 1963-1964, Plaintiff collaborated with lyricist Sam Bobrick ("Bobrick") on the musical composition *It'll Never Be Over For Me*.  Plaintiff wrote the music and Bobrick wrote the lyrics.

35.     On or about January 20, 1964, Plaintiff and Bobrick entered into a contract (the "Bourne Contract") with music publisher Bourne Music, Inc. ("Bourne") by which Plaintiff and Bobrick assigned their ownership rights relating to *It'll Never Be Over For Me* to Bourne for the initial 28-year term of the copyright.

36.     Bourne registered the copyright for *It'll Never Be Over For Me* on or about February 12, 1964 under Copyright Registration No. EU0000810899.

37.     Plaintiff renewed the copyright registration for *It'll Never Be Over For Me* on or about January 17, 1992.  Copies of the copyright registration and renewal applications for *It'll Never Be Over For Me* are annexed as Exhibit C.

38.     The Bourne Contract expired at the end of the initial 28-year copyright term in 1992 and ownership of *It'll Never Be Over For Me* reverted to Plaintiff and Bobrick.

39.     On or before October 5, 1997, Bobrick assigned all of his ownership rights relating to *It'll Never Be Over For Me* to Norick Music Inc. ("Norick").

40.     Plaintiff has been an owner and officer of Norick since it was formed in 1979.  As of June 3, 2002, Plaintiff was 100% owner of Norick.  Norick has assigned all of its ownership rights relating to *It'll Never Be Over For Me* to Plaintiff.

41.     Plaintiff is the sole legal and beneficial owner of the copyrighted musical composition *It'll Never Be Over For Me*.

**Infringement of the Subject Compositions**

42.     The Defendants have all reproduced, distributed, and sold (and/or are presently reproducing, distributing, and selling) digital recordings embodying the Subject Compositions as individual downloads or as part of various albums as described on the chart annexed as Exhibit D.

43.     Defendants have infringed, and are continuing to infringe, Plaintiff's copyright in the composition *The Prowl* by copying, reproducing, distributing, and selling recordings embodying this composition as set forth in Exhibit D without anyone obtaining a license from

Plaintiff or serving Plaintiff with a statutory notice for a compulsory license under 17 U.S.C. § 115.

44.     Defendants have infringed, and are continuing to infringe, Plaintiff's copyright in *Jazz is His Old Lady and My Old Man* by copying, reproducing, distributing, and selling recordings embodying this composition as set forth in Exhibit D without anyone obtaining a license from Plaintiff or Ms. Bross or serving Plaintiff or Ms. Bross with a statutory notice for a compulsory license under 17 U.S.C. § 115.

45.     Defendants have infringed, and are continuing to infringe, Plaintiff's copyright in *It'll Never Be Over For Me* by copying, reproducing, distributing, and selling recordings embodying this composition as set forth in Exhibit D without anyone obtaining a license from Plaintiff, Bobrick, Bourne, or Norick, or serving Plaintiff, Bobrick, Bourne, or Norick with a statutory notice for a compulsory license under 17 U.S.C. § 115.

46.     Upon information and belief, various record labels, including Master Classics Records, Classic Records, One Media Publishing, THS Records, Angeli Record, East Side Records, Andys/Jahmel Music, Bringins Music, P.E.R. Records, and Synergy Records, have reproduced recordings of the Subject Compositions, made them part of albums, and have provided the recordings to aggregators such as Orchard, Believe Digital, Entertainment One Distribution, Zojak World Music, and IRIS.

47.     Orchard and the other aggregators identified in the Infringement Chart annexed as Exhibit D have, in turn, reproduced and distributed such recordings to Apple, Amazon, Google, Microsoft, EMusic, and other digital music sellers.

48.      No one ever obtained a license, whether by agreement or pursuant to 17 U.S.C. § 115, for any of the Defendants to reproduce, compile, distribute, or sell the recordings

embodying Plaintiff's copyrighted compositions *The Prowl*, *Jazz is His Old Lady and My Old Man*, and *It'll Never Be Over For Me* in the manner described above.

49.    Exhibit E annexed to this Complaint includes pdf copies obtained from the websites of Apple, Amazon, Google, Microsoft and EMusic showing each online music store's catalog entry for each of the digital recordings embodying the Subject Compositions described above.  In many cases, these catalog entries also list the names of the record label and/or aggregator that uploaded the composition to the Defendants' online stores.

50.    Apple, Amazon, Google, Microsoft, EMusic, and Orchard are infringing Plaintiff's copyrights in the Subject Compositions under 17 U.S.C. § 106 and, for the reasons set forth below, the infringement is willful in that: (a) Defendants were and are actually aware of the infringing activity, or (b) the Defendants' actions were the result of reckless disregard for, or willful blindness to Plaintiff's rights.

### Class Allegations

51.    In addition to infringing Plaintiff's copyrights in the Subject Compositions, the Defendants have also willfully infringed at least thousands of other copyrighted compositions.

52.    Plaintiff brings this action on behalf of himself, and all others similarly situated, pursuant to FRCP Rules 23(a), 23(b)(2) and 23(b)(3) on behalf of the following class (the "Class"):

> All persons or entities who own all or part of one or more registered copyrighted musical compositions that have been reproduced, distributed, or sold by Defendants.

53.    The Class is so numerous that joinder of all members is impracticable.  Due to the nature of the commerce involved, the members of the Class are geographically dispersed throughout the United States.  While the exact number of Class members is in the sole

possession, custody and control of the Defendants, Plaintiff believes that there are thousands or perhaps tens of thousands or more members of the Class.

54.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among questions of law and fact common to the Class are:

       a.     whether the Defendants used, reproduced, distributed, and/or sold digital recordings of songs embodying copyrighted musical compositions owned or controlled by members of the Class for the Defendants' own commercial purposes;

       b.     whether the Defendants' use, reproduction, and/or distribution of such musical compositions constitute copyright infringement;

       c.     whether such copyright infringement was willful;

       d.     whether the Class has suffered damages as a result of the Defendants' actions, and if so, the measure and amount of such damages; and

       e.     whether injunctive and/or declaratory relief is appropriate.

55.     Plaintiff's claims are typical of the claims of the other members of the Class he seeks to represent.  Defendants' illegal practices have targeted and affected all members of the Class in a similar manner, *i.e.*, they have all sustained damages arising out of Defendants' willful conduct in violation of the Copyright Act.

56.     Plaintiff will fully and adequately protect the interests of all members of the Class.  Plaintiff has retained counsel experienced in both complex class action and copyright infringement litigation.  Plaintiff has no interests which are adverse to or in conflict with other members of the Class.

57.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable.  The prosecution of separate actions by individual members of the class would impose heavy burdens

10

upon the courts, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

58.     The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical.  The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.  The damages suffered by the individual Class members may be relatively small; and therefore, the expense and burden of individual litigation make it virtually impossible for class members to redress the wrongs done to them.  Plaintiff anticipates no difficulty in the management of this action as a class action.

## **Mechanical Licenses**

59.     There are two separate and distinct copyrights in every recorded musical performance – the song, comprised of the underlying musical arrangement and accompanying lyrics (the "song" or the "musical composition") and the sound recording of the performance of that song (the "recording").  The most popular songs in the world are recorded by innumerable artists all over the world.  Although each recording of any given song is as unique as the recording artists' voice, instrumentation, accompaniment, equipment and performance, the song (or composition) remains the same.  The owner of the copyright in the sound recording is typically referred to as a "record label" while the owner of the copyright in the song is referred to as the "songwriter" or "music publisher."

11

60.     Under the Copyright Act, Plaintiff and all owners of the copyrights in non-dramatic musical compositions have the exclusive right to reproduce and distribute their copyrighted songs, including by means of digital transmission, and to authorize others to engage in such activity.  17 U.S.C. § 106.

61.     Once a song is distributed publicly, anyone can obtain a license to record the song, provided they meet the requirements of the Copyright Act.  To secure the right to physically reproduce copies of a song in sound recordings (the "mechanical right"), the party who seeks to record a song must obtain a "mechanical license" from the copyright owner of the musical composition.

62.     The right to reproduce the song in a recording can be licensed from the copyright owner of the musical work in a number of ways.  The most common of these are "controlled composition" licenses, negotiated licenses, and compulsory licenses.

### Controlled Composition Licenses

63.     Where the songwriter is also the recording artist performing the song on the recording, a provision of the recording artist's agreement with his record label typically grants the record label a mechanical license for all songs authored by the recording artist; this is known as the "controlled composition" provision of a recording agreement.

64.     Controlled composition clauses generally provide for reduced royalty rates payable on the subject compositions.  The royalty rates in these provisions are usually based on a percentage reduction of the statutory rate.

65.     Under the Copyright Act, if the owner of a recording also has a license from the publisher for the composition, no further licensing is required.  17 U.S.C. § 115(c)[3](G).

*Negotiated Mechanical Licenses*

66.     Traditionally, the major record labels typically had staff (or full departments) dedicated to securing mechanical licenses by negotiating directly with copyright owner of the song (or, failing that, by utilizing the compulsory licensing provisions of Section 115).   In addition, record labels frequently outsourced the job of securing mechanical licenses to third parties who charge a fee for this service.   There are a number of third party services that license, or secure mechanical licenses, in exchange for a fee.

67.     One third-party service is the Harry Fox Agency ("HFA") (owned by the National Music Publishers Association).   HFA is an agent of participating music publishers that is authorized to issue mechanical licenses on their behalf to requesting record labels or other licensees.   Another third party service is Rights Flow (owned by Google).   Rights Flow is hired by record labels and other licensees, to secure mechanical licenses from music publishers in exchange for a fee.

*Compulsory Mechanical Licenses*

68.     Section 115 of the Copyright Act governs compulsory mechanical licenses of musical compositions, such that an owner of a musical composition is required to grant a non-exclusive license to anyone who wants to reproduce and distribute recordings of a song.

69.     Although the mechanical license is compulsory, specific rules must be followed to obtain the license under the law.   The person or entity seeking a compulsory license must provide notice, account, and pay royalties to the copyright owner.

70.     As for notice, "[a]ny person who wishes to obtain a compulsory license under [Section 115] shall, before or within thirty days after making, and before distributing any phonorecords of the work, serve notice of intention to do so on the copyright owner."   Section

115(b)[1].  The content and method of service of the notice are prescribed by statute and regulation.  17 U.S.C. § 115(b); 37 CFR 201.18.

71.    With respect to accounting and royalties, the person or entity who obtains a compulsory license must make royalty payments, accompanied by a monthly statement of account, to the copyright owner or authorized agent of the owner on or before the 20th day of each month for every phonorecord made and distributed in accordance with the license.  The royalty rates are set by the Copyright Royalty Board and the current rates are 9.10 Cents per copy for songs 5 minutes or less or 1.75 Cents per minute or fraction thereof, per copy for songs over 5 minutes.  Licenses issued after March 1, 2009 are subject to interest for late payments of 1.5% a month, or 18% a year.

### Failure to Obtain a Mechanical License

72.    When mechanical licenses are not obtained, the copyright owners of the songs and the songwriters do not get paid for the reproduction and distribution of their music.  For songwriters whose songs are not played on the radio or TV, the royalties earned from mechanical licenses is often the only income they ever earn from their songs.

73.    Moreover, reproducing a song without a mechanical license is copyright infringement which may not be cured after the fact by attempting to obtain a compulsory license.  Section 115 further provides that "[f]ailure to serve or file the notice required by clause [1] forecloses the possibility of a compulsory license and, in the absence of a negotiated license, renders the making and distribution of phonorecords actionable as acts of infringement…"  In other words, failure to obtain the compulsory license **before** recording, reproducing, or distributing the song in sound recordings is copyright infringement.

74.     Under the Digital Performance Recording Act of 1995 ("DRPA"), the songwriter's exclusive right to reproduce his song, and the compulsory licensing provisions that previously applied to physical reproductions, were extended to downloadable copies of recordings embodying his song.

75.     The legislative history of the DPRA makes it clear that Congress intended to protect writers and publishers from copyright infringement and to insure that they received their rightful share of revenues earned from their songs:

> The intention in extending the mechanical compulsory license to digital phonorecord deliveries is to maintain and reaffirm the mechanical right of songwriters and music publishers as new technologies permit phonorecords to be delivered by wire or over the airwaves rather than by the traditional making and distribution of records, cassettes and CD's.

Senate Report No. 104-128, S. Rep. 104-128 (1995) at 26.

> It confirms the existing "mechanical rights" of writers and publishers (i.e. the right to be paid when compact discs and cassettes embodying their music are distributed) apply to certain distributions [downloads] of phonorecords by digital transmission (referred to in the bill as "digital phonorecord deliveries").

House Report No.104-274, H.R. Rep, 104-274 (1995) at 21.

76.     The legislative history of DRPA also makes it clear that Congress allowed the music industry to negotiate how to allocate responsibility among record labels and digital music sellers (such as iTunes) for obtaining the mechanical licenses but recognized that, ultimately, it was the responsibility of the digital music sellers (such as iTunes) to obtain mechanical licenses for music sold online because a failure to do so would subject them to liability for copyright infringement:

> Thus, the changes to section 115 are designed to minimize the burden on transmission services [such as iTunes] by placing record companies in a position to license not only their own [sound recording] rights, but also, **if they choose to do so**, the rights of writers and music

15

publishers to authorize digital phonorecord deliveries; and by recognizing that transmission services themselves may obtain a compulsory license to make digital phonorecord deliveries.

As between a digital transmission service and a record company, allocation of the responsibility for paying mechanical royalties could be a subject of negotiation, but copyright owners of musical works would only be entitled to receive one mechanical payment for each digital phonorecord royalty, not multiple payments. ***Of course, a digital transmission service would be liable for any infringing digital phonorecord delivery it made in the absence of a compulsory license or the authorization of the musical work copyright owner***.

Senate Report No. 104-128, S. Rep. 104-128 (1995) at 27 (emphasis added).

If a record company grants a license under its rights in the sound recording only, and does not grant a mechanical license under the copyright in the musical work embodied in the sound recording, ***it is the transmission service's [such as iTunes] responsibility to obtain a license under the musical work copyright***.

Senate Report No. 104-128, S. Rep. 104-128 (1995) at 31.

77.     As discussed below, despite the provisions of the Copyright Act that provide for "compulsory" licensing and the wide availability of third parties who will secure licenses for a fee, the Defendants herein frequently failed to obtain mechanical licenses for the music sold in their digital retail stores.

### The Digital Music Business

78.     Broadly described, the digital music business consists of four groups: (a) the artists (singers and songwriters); (b) record labels who record the artists' musical compositions; (c) aggregators who acquire digital distribution rights to recordings from the labels and market the music, primarily by uploading the digital recordings to online digital stores; and (d) digital music retailers who market and sell the music online.

79.     Traditionally, record labels were complex businesses that included fully-staffed divisions such Artists and Repertoire (A&R), Business & Legal Affairs, Licensing, and

Production.  One of the responsibilities traditionally discharged by the record labels was securing mechanical licenses for the compositions they intended to record and sell.

80.     With the advent of online digital music stores, the responsibility to perform the administrative and licensing functions traditionally performed by the major labels has fallen to the digital music retailers and aggregators such as the Defendants.  The Defendants, however, have failed to perform their licensing obligations to the full extent required by law.

81.     Today, advances in technology have made it possible for any person to record a song on their laptop or cell phone, pay $9.95 to a distributor, and have that recording be made available for sale on iTunes and other digital stores.  Within days, anyone with a credit card and internet connection can record themselves singing their favorite song and, through an aggregator, upload their version of the song for sale in the iTunes store, where it will join thousands of other unlicensed songs.  In many instances, however, no mechanical licenses are obtained from the owner of the copyright in the composition.

82.     The Retailer Defendants include four of the most powerful technology companies in the world - Apple, Amazon, Google, and Microsoft.  These companies operate digital stores (iTunes, Amazon MP3, Google Play, Zune Marketplace), operating systems (Android), software and hardware (iPods, iPads, Macs, Kindles, Zunes, PCs) with which to purchase and consume music.

83.      The Retailer Defendants accept virtually every recording delivered to them, without qualification, by digital music aggregators (including Orchard) who acquire digital distribution rights from record labels and individual music artists.

84.     There are now over one million record "labels" (including individuals operating as personal record labels) submitting their recordings to aggregators for sale by the Retailer

Defendants in hope of making a profit.  These record labels upload music to aggregators such as Orchard who, for a fee, post the music to the online stores of the Retailer Defendants who then make the recordings infinitely downloadable to the purchasing public.

85.     This model has, in less than a decade, upended more than a century of established business practices in the selling of recorded music.  Today, for the first time, digital music sales represent more than half of all music purchased in the United States.

86.     The retail digital music revolution did not happen overnight.  Over the last ten years, digital music sales increased at a steady doubling pace that masked the growing mass copyright infringement by the Retailer Defendants.  The development of the digital music business is best illustrated by the growth of iTunes.

## The iTunes Store

87.     The iTunes Store is a software-based online digital media store owned by Apple that opened in April 2003.  In that year, downloads represented less than 0.1% of all music sold – less than CDs (95%), cassettes (0.9%) and even vinyl singles (0.2%).  Starting from almost zero in 2003, the size of the digital music industry nearly doubled each year, so that 0.1% in 2003 turned into a majority of all music sales by 2011.

88.     When the iTunes Store launched in 2003, Apple did deals with the then five major labels (Sony, BMG, Warner, Universal and EMI) and launched with 200,000 recordings available for sale in its store.  Many of these recordings were "controlled compositions" described above, wherein the record label that posted the recording to iTunes owned the copyright in the recording and had a controlled composition clause in its agreement with the recording artist by which it (arguably) obtained the mechanical license for digital distribution.

89.     By 2010, less than seven years after its launch, Apple announced that the iTunes Store "features the world's largest music catalog with over 12 million songs".  Two years later, Apple had added another 16 million songs, according to its chief financial officer, Peter Oppenheimer, who stated during the company's quarterly earnings call in April, 2012 that iTunes now had over 28 million songs available for sale.

90.     Apple achieved this dramatic increase in the size of its iTunes catalog by greatly expanding its stable of digital music providers.  No longer limited to a few major record labels (with fully-staffed and functioning licensing departments), Apple entered agreements with numerous independent "labels" and digital aggregators (such as Orchard).  As discussed below, many of these content providers did not have any staff devoted to licensing.  They did not spend the time and resources necessary for ensuring that all the songs they posted to online stores such as iTunes were properly licensed.

91.      Today the iTunes Store contains over 28 million tracks originating from thousands of "labels".  Apple does not have sufficient staff or procedures in place to ensure that the mechanical rights for the music it offers for sale are properly licensed.

92.     Apple's policy of selling everything delivered to it, combined with its refusal to secure mechanical licenses, and electing willful blindness to the infringing status of compositions in its iTunes Store, helped enable Apple to create the largest and most dominant music store in the history of the world within a few years of its opening.

93.     As of October, 2011, Apple claimed to have sold over 16 billion songs through iTunes.  Currently, iTunes has over a 70% share of the digital music market in the United States and it is estimated that 28% of all music bought in the United States today is purchased from the iTunes Store.

**<u>Amazon MP3, Google Play, Zune, EMusic</u>**

94.     In an effort to keep pace with Apple's dominance in the digital music business, the leading technology companies, with no history in the music business, jumped into the digital music business and copied the iTunes business model of accepting everything delivered to it, securing no mechanical licenses, and willfully ignoring whether musical compositions sold in its store had been properly licensed from the copyright owner.

### *Amazon MP3*

95.     Amazon MP3 is a digital music store owned and operated by Amazon that launched in beta in or around September 2007.  According to its website, Amazon MP3's catalog now contains over 20 million songs.  Amazon MP3 allows its customers to purchase music from its catalog by digital download, burning a CD, or by storage in the Amazon Cloud.  Currently, Amazon MP3 has over 10% of the digital music market.

### *Google Play*

96.     Google Play is a digital music store owned and operated by Google that was originally launched as the "Google music store" within the Android Market in November 2011. There are over 13 million songs available on Google Play and Google allows its customers to purchase music from its catalog by digital download or by storage online.

### *Zune*

97.     Zune is a digital music store owned and operated by Microsoft.  There are over 14 million songs available on Zune and Microsoft allows its customers to purchase music from its catalog by digital download or by storage online.  Microsoft also offers the Zune Music Pass, a music subscription service, which allows subscribers to download an unlimited number of songs for as long as their subscription is active.

*eMusic*

98.     eMusic.com is a digital music store owned and operated by EMusic that was originally launched in 1998.  There are over 13 million songs available on EMusic which customers may purchase by digital download or through a monthly subscription service that allows its users to download a fixed amount of tracks to their MP3 players per month.

## The Aggregators

99.     There are a number of digital music aggregators, or distributors, including Orchard, that work with other aggregators and small to large record labels across all genres of music.

100.     Apple, Amazon, Google, Microsoft, and EMusic have accepted and continue to accept and make available for sale all recordings that record labels and the aggregators, including Orchard, deliver to them.  The aggregators, including Orchard, have not obtained mechanical licenses for all of the music they sell in online music stores.

101.     The aggregators, including Orchard, have direct accounts with Digital Retailers to supply unlimited amounts of digital recordings for sale in the respective digital stores.

102.     The aggregators, including Orchard, compete with each other for digital distribution rights to record labels' recordings based on pricing, payouts, and service.

103.     Digital music retailers do not require aggregators to provide proof of mechanical licenses for all the music they post for sale in their digital music stores.

104.     Distributors such as Orchard do not obtain mechanical licenses, or confirm that such licenses have been obtained, for all the music they distribute via online music stores.

***Orchard***

105.    Orchard is an independent music and video distribution, marketing, and sales company that works with independent artists, labels, and other content providers to distribute musical content to online digital music stores such as iTunes, Amazon MP3, Google Play, Zune, and EMusic.

106.    According to a 2003 press release, Orchard was then the largest supplier of independent music (music not owned by the major record labels) to the iTunes Store.

107.    Upon information and belief, Orchard has agreements with the Retailer Defendants, whereby they permit Orchard, at no cost, to upload every digital recording it aggregates from its labels to the Retailer Defendants' online stores to be made available for sale.

108.    Orchard and the Retailer Defendants each take a commission on the online sales and Orchard pays the balance to the record label or other content provider.

109.    Upon information and belief, Orchard has agreements with hundreds, possibly thousands of record labels, whereby Orchard has the contractual right to distribute the respective record label's digital sound recordings for sale in the Retailer Defendants' online stores.

110.    Orchard admittedly does not obtain the required mechanical licenses for all the music it distributes.  For example, in its 2008-2009 SEC filings, Orchard admitted that it has not obtained mechanical licenses (or independently confirmed that its clients have done so) for much of the music it distributes online.  Rather, Orchard claimed that it administered mechanical royalties only to certain artists and labels:

> ***We could be liable for unpaid mechanical royalty obligations and bear liability for copyright infringement if our label clients fail to license and/or pay mechanical copyright royalties owed or if, where contractually obligated to do so, we fail to properly license and/or pay mechanical copyright royalties, which could have a negative effect on our business.***

> Mechanical royalties are the statutory or other payment due to the publisher of the underlying musical composition embodied in the master recording.  We administer mechanical royalties for certain artists and record labels.  All other artists and labels that we distribute represent and warrant to us that they will secure the appropriate licenses and pay any royalties due, and agree to indemnify us if they do not.  We believe this is common practice among digital distributors.  As a result, in certain instances and under certain circumstances, if the required payments are not made, we could be liable for unpaid mechanical royalty obligations and bear liability for copyright infringement…

The Orchard Enterpises, Inc., 10-K for 2009 (emphasis in original).

111.    Upon information and belief, Orchard's practices have not changed significantly or sufficiently since its last SEC filing in 2010 and it continues in its failure to properly license all of the music it uploads to online digital stores.

## COUNT I

### (Copyright Infringement – 17 U.S.C. § 101 et seq.)

112.    Plaintiff re-alleges and incorporates by reference all of the allegations of this Complaint with the same force and affect as if fully restated herein.

113.    Defendants are reproducing, distributing, and selling recordings embodying the copyrighted musical compositions, of Plaintiff, including the Subject Compositions, and of the Class.

114.    By reason of the conduct described above, Defendants are directly liable for copyright infringement.  Each violation of each of Plaintiff's and the Class's rights in and to each musical composition constitutes a separate and distinct act of copyright infringement.

115.    By their conduct described above, Defendants have infringed and are continuing to infringe copyrights of Plaintiff and the Class on a daily basis by creating unauthorized reproductions of sound recordings embodying  the copyrighted musical compositions of Plaintiff

and the Class and distributing such recordings to the public in violation of 17 U.S.C. §§ 106, et seq.

116.    Defendants' copyright infringement has caused substantial damage to Plaintiff and to the Class.  As a direct and proximate result of Defendants' infringement, Plaintiff and the Class are entitled to statutory damages under 17 U.S.C. § 504(c) for each act of infringement.

117.    Defendants' infringement is and has been willful, intentional, purposeful and willful disregard of the rights of Plaintiff and the Class.  As an alternative to statutory damages (and for works that do not qualify for statutory damages, if any), Plaintiff and the Class, at their election and prior to judgment, are entitled to collect their actual damages and any additional profits of the Defendants attributable to the infringement. 17 U.S.C. § 504(a)-(b).

118.    Plaintiff and the Class are entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

119.    Unless enjoined by this Court, Defendants will continue to cause Plaintiff and the Class irreparable injury that cannot be fully compensated or measured in money. Plaintiff and the Class have no adequate remedy at law.  Pursuant to 17 U.S.C. § 502, Plaintiff and the Class are entitled to a permanent injunction prohibiting Defendants from reproducing, distributing, and selling their copyrighted works without a license in violation of the Copyright Act.

## **Demand for Jury Trial**

120.    Pursuant to Federal Rule of Civil Procedure 38(b), and otherwise, Plaintiff respectfully demands a trial by jury.

## **Prayer for Relief**

WHEREFORE, Plaintiff respectfully requests that judgment be entered against

Defendants as follows:

1. An order certifying this case as a class action and appointing Plaintiff and his counsel to represent the Class;

2. A declaration that Defendants have infringed Plaintiff's and the Class's copyrighted works in violation of the Copyright Act;

3. A declaration that Defendants' infringement was willful;

4. An award of statutory damages, Plaintiff's and the Class's actual damages, and/or Defendants' profits;

5. A permanent injunction barring the Defendants from continued infringement of the copyrights of the Class members pursuant to 17 U.S.C. § 502; and

6. Reasonable attorney's fees and costs of this action, statutory pre-judgment interest, and such other relief as this Court may deem just and proper.

Dated: New York, New York
      October 12, 2012

GISKAN SOLOTAROFF
ANDERSON & STEWART LLP


_____
Oren S. Giskan
Jason L. Solotaroff
11 Broadway - Suite 2150
New York, New York 10004
Telephone: (212) 847-8315

SCHWARTZ & PONTERIO, PLLC
Matthew F. Schwartz
Brian S. Levenson
134 West 29th Street, Suite 1006
New York, NY 10001
Telephone: (212) 714-1200

*Attorneys for Plaintiff and the Proposed Class*