UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NORMAN BLAGMAN, individually and on behalf   :
of all others similarly situated,   :
  :
                       Plaintiff,   :      Docket No. 12 CIV 5453 (ALC)
  :
    -against-   :      **THIRD AMENDED CLASS**
  :      **ACTION COMPLAINT AND**
  :      <u>**DEMAND FOR JURY TRIAL**</u>
APPLE INC.,  AMAZON.COM, INC., GOOGLE INC.,   :
MICROSOFT CORPORATION, EMUSIC.COM INC.,   :
THE ORCHARD ENTERPRISES, INC.,   :
ORCHARD ENTERPRISES NY, INC.,   :
and John Does 1-10, persons and entities whose identities   :
are unknown to Plaintiff but who have performed   :
and participated in the unlawful acts alleged herein,   :
  :
                      Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

      If copyright dies, if patents die, if the protection of intellectual property is
eroded, then people will stop investing. That hurts everyone. People need to have
the incentive so that if they invest and succeed, they can make a fair profit. But on
another level entirely, it's just wrong to steal. Or let's put it this way: It is
corrosive to one's character to steal. We want to provide a legal alternative.

                   Steve Jobs, *Rolling Stone* interview, December, 2003

### <u>Class Action Complaint</u>

    Plaintiff, individually and on behalf of all others similarly situated, hereby brings this

Class Action Complaint and states as follows:

### <u>Introduction</u>

    1.      Defendants Apple, Amazon, Google, EMusic and Microsoft (collectively "the

Retailer Defendants") together sell almost all the downloaded music in the United States but they

fail to license the musical works they sell. Instead, the Retailer Defendants accept and sell

unlicensed music from Defendants The Orchard Enterprises, Inc. and Orchard Enterprises NY,

Inc. (collectively, "Orchard")  and other music aggregators in willful violation of United States copyright laws.

2.      Plaintiff, individually and on behalf of all similarly situated persons and entities, seeks relief from Defendants for the unlawful reproduction, distribution, importation, exportation, and sale of copyrighted musical works by Defendants.

3.      The Retailer Defendants who own and operate the largest digital music retail stores in the world – iTunes, Amazon MP3, Google Play, Zune Marketplace, Xbox Music, and EMusic – are required by statute to obtain a license to reproduce and distribute the musical works they sell to consumers as permanent downloads.

4.      Defendant Orchard and other digital music aggregators, who act as the middlemen between the Retailer Defendants and the record labels who provide digital music ("content"), are required by statute to obtain a license to reproduce and distribute the musical works they reproduce and distribute to the Retailer Defendants. In addition, when importing or exporting copyrighted musical works, all of the Defendants are required to obtain authorization from the owner of the copyright, under Section 602 of the Copyright Act, before such importation or exportation.

5.      None of the Defendants, however, are meeting their statutory obligation to obtain licenses to reproduce and distribute musical works or import/export authorization for all of the musical compositions they reproduce, distribute, and sell online. Nor have they confirmed that the persons or entities who supply content to them have obtained the required mechanical licenses. Nor do they obtain authorization from the copyright owners before importing or exporting copyrighted musical works.

6.      Instead, all of the Defendants are unlawfully copying, distributing, selling, importing and exporting the Plaintiff's copyrighted musical works (and the copyrighted musical works of others in the Class) and profiting greatly from their illegal activities, all without authorization or permission from Plaintiff or members of the Class.

7.      The Defendants' failure to properly license the musical works derives from two factors: (a) the Retailer Defendants reproduce, distribute and sell virtually all content delivered to them; and (b) the Defendants take no direct action to obtain mechanical licenses or to confirm that such licenses were obtained for the musical works they reproduce, distribute and sell and instead rely on their suppliers to perform this vital function.

8.      As a result, a number of unlawful operators have gained access to the Retailer Defendants' online stores for the purpose of selling content embodying copyrighted musical compositions owned by Plaintiff and members of the Class without license or authorization.

9.      The record label names used by these unlawful operators are listed in Exhibit A to this Third Amended Complaint and some are discussed in detail below.

10.      While Defendants do not create the unlawful music they reproduce, distribute and sell, they do profit from it in several ways. First, the Retailer Defendants and aggregators such as Orchard receive a hefty portion of all proceeds from the sale of unlicensed music – often more than 50%.

11.      Second, and perhaps as important, the Retailer Defendants have benefited from having a substantial volume of content available quickly in their online stores. In the competition for market share, each of the Retailer Defendants frequently boasted of the millions of songs available in their stores. In their rush to accumulate massive amounts of content, however, the

Retailer Defendants delegated the vital licensing function to unlawful operators and turned a blind eye to their suppliers' unlawful activities.

12.     Defendants willfully ignore their statutory obligations to obtain a mechanical license before reproducing and distributing copyrighted musical compositions and to obtain authorization from the copyright owners before the importation or exportation of copyrighted musical works.

13.     When mechanical licenses are not obtained, the publishers and the songwriters do not get paid for the reproduction and distribution of their music. As a result, Defendants have engaged in a massive and systematic course of infringing conduct that, although quite lucrative for the Defendants, infringes on Plaintiff's copyrights and deprives Plaintiff, and thousands of other songwriters and publishers, of their rightful share of the proceeds from the sale of their music.

14.     Defendants' conduct constitutes willful copyright infringement in violation of the United States Copyright Act [17 U.S.C. §§ 101, 106, 115, 501, 602 et seq.] (the "Copyright Act"). Plaintiff seeks an order enjoining further infringement by Defendants together with statutory damages of $750 for each infringement of a copyright owned by Plaintiff or member of the Class and attorneys' fees.

### Jurisdiction and Venue

15.     The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1338(a) because this is an action arising under the Copyright Act of 1976, 17 U.S.C. §§ 101, 106, 115, 501, 602 et seq.

16.     This Court has personal jurisdiction over Defendants because Defendants do systematic and continuous business and/or have a place of business in this Judicial District.

17.     Venue is proper in this District pursuant to 28 U.S.C 1391(b), 1391(c) and 1400(a) because Defendants are subject to personal jurisdiction in this Judicial District and have committed unlawful acts of infringement in this Judicial District. In addition, at least one of the Defendants has its principal place of business in this Judicial District.

### Norman Blagman

18.     Norman Blagman ("Blagman") is a resident of the State of New Jersey.

19.     Blagman is a music publisher and has been a successful songwriter since the 1950's. Elvis Presley recorded two of his songs, *Put The Blame On Me* and *Give Me The Right*. Blagman composed the song *Love Power*, which was used in the movie "The Producers" and co-wrote the music and co-produced two albums for MAD Magazine: MAD "Twists" Rock 'N' Roll and Fink Along with MAD.

### Defendants

20.     Apple, Inc. ("Apple") is a California corporation with a principal place of business in Cupertino, California. Apple owns and operates The iTunes Store ("iTunes"), a software-based online digital media store that is the most popular music vendor in the world, currently offering over 26 million tracks.

21.     Amazon.com, Inc. ("Amazon") is a Delaware corporation with its principal place of business in Seattle, Washington. Amazon owns and operates Amazon MP3, an online music store with a catalog of over 20 million tracks.

22.     Google Inc. ("Google") is a Delaware corporation with its principal place of business in Mountain View, California. Google owns and operates Google Play, a digital-distribution multimedia-content service that includes an online store for music with a catalog of over 18 million tracks.

23.    Microsoft Corporation ("Microsoft") is a Washington corporation with its principal place of business at One Microsoft Way, Redmond, Washington. Microsoft has owned and operated several online digital music services, including Zune and, currently, Xbox Music, an online music store with a catalog of over 30 million tracks.

24.    EMusic.com Inc. ("EMusic") is a Delaware corporation with a principal place of business in New York, New York. EMusic owns and operates the EMusic online music store with a current catalog of over 17 million tracks.

25.    The Orchard Enterprises, Inc. is a Delaware corporation with principal offices located at 23 East 4th Street, 3rd Floor, New York, NY 10003.

26.    Orchard Enterprises NY, Inc. is a New York corporation with principal offices located at 23 East 4th Street, 3rd Floor, New York, NY 10003.

27.    Together, The Orchard Enterprises, Inc. and Orchard Enterprises NY, Inc. (collectively, "Orchard") engage in the world-wide distribution of digital music through internet based retailers such as iTunes, Amazon MP3, Google Play, Zune Marketplace, Xbox Music, and EMusic. One of the Orchard entities is the corporate parent of the other.

28.    Upon information and belief, Plaintiff alleges that John Does 1-10, directly or indirectly, jointly or severally, willfully undertook, performed and participated in the unlawful acts alleged herein. Their identity is not known to Plaintiff at this time.

## The Subject Compositions

29.    Plaintiff is a legal and/or beneficial owner of the copyrighted musical compositions *The Prowl*, *Jazz is His Old Lady and My Old Man*, and *It'll Never Be Over For Me* (collectively, the "Subject Compositions"), all of which were registered with the U.S. Copyright Office prior to January 1, 1998 and all of which have been reproduced, distributed, imported,

exported, or sold on phonorecords, including by means of digital phonorecords delivery, by the defendants in violation of the Copyright Act between July 20, 2009 and January 1, 2015 (the "Class Period").

### *The Prowl*

30.     Plaintiff wrote the music for *The Prowl* and registered the copyright for the composition on or about April 18, 1966 under Copyright Registration No. EU0000936529.

31.     Plaintiff registered the copyright for *The Prowl* using his trade name Sinolouge Music ("Sinolouge") under which he conducted certain music business. Sinologue was never formed as a corporation or any other type of legal entity and Plaintiff was the sole owner of Sinolouge.

32.     Plaintiff renewed the copyright registration for *The Prowl* on or about January 3, 1994.

33.     Copies of the copyright registration and renewal certificates for *The Prowl* are annexed as Exhibit B.

34.     Plaintiff is the sole legal and beneficial owner of the copyrighted musical composition *The Prowl*.

### *Jazz Is His Old Lady And My Old Man*

35.     In or around 1977, Plaintiff collaborated with lyricist Gianni Bross ("Bross") on the musical composition *Jazz Is His Old Lady And My Old Man*. Plaintiff wrote the music and Bross wrote the lyrics.

36.     Plaintiff registered the copyright for *Jazz Is His Old Lady And My Old Man* on or about April 1, 1977 under Copyright Registration No. EU0000770965.

37.     Plaintiff renewed the copyright registration for *Jazz Is His Old Lady And My Old Man* effective January 4, 2005.

38.     Copies of the copyright certificate and renewal certificate for *Jazz Is His Old Lady And My Old Man* are annexed as Exhibit C.

39.     Plaintiff and Bross are the sole legal and beneficial owners of the copyrighted musical composition *Jazz Is His Old Lady And My Old Man*.

### *It'll Never Be Over For Me*

40.     In or around 1963-1964, Plaintiff collaborated with lyricist Sam Bobrick ("Bobrick") on the musical composition *It'll Never Be Over For Me*. Plaintiff wrote the music and Bobrick wrote the lyrics.

41.     On or about January 20, 1964, Plaintiff and Bobrick entered into a contract (the "Bourne Contract") with music publisher Bourne Music, Inc. ("Bourne") by which Plaintiff and Bobrick assigned their ownership rights relating to *It'll Never Be Over For Me* to Bourne for the initial 28-year term of the copyright.

42.     Bourne registered the copyright for *It'll Never Be Over For Me* on or about February 12, 1964 under Copyright Registration No. EU0000810899.

43.     Plaintiff renewed the copyright registration for *It'll Never Be Over For Me* on or about January 17, 1992. Copies of the copyright registration and renewal applications for *It'll Never Be Over For Me* are annexed as Exhibit D.

44.     The Bourne Contract expired at the end of the initial 28-year copyright term in 1992 and ownership of *It'll Never Be Over For Me* reverted to Plaintiff and Bobrick.

45.     On or before October 5, 1997, Bobrick assigned all of his ownership rights relating to *It'll Never Be Over For Me* to Norick Music Inc. ("Norick").

46.     Plaintiff has been an owner and officer of Norick since it was formed in 1979. As of June 3, 2002, Plaintiff was 100% owner of Norick. Norick has assigned all of its ownership rights relating to *It'll Never Be Over For Me* to Plaintiff.

47.     Plaintiff is the sole legal and beneficial owner of all U.S. rights with respect to the copyrighted musical composition *It'll Never Be Over For Me*.

### Infringement of the Subject Compositions

48.     The Defendants have all imported, exported, reproduced, distributed, or sold (and/or are presently importing, exporting, reproducing, distributing, or selling) phonorecords of the Subject Compositions including by means of a digital phonorecord delivery, as individual downloads or as part of various albums as described on the chart annexed as Exhibit E.

49.     Defendants have infringed, and are continuing to infringe, Plaintiff's copyright in the composition *The Prowl* by reproducing, distributing, selling, and exporting phonorecords of this musical work including by means of a digital phonorecord delivery as set forth in Exhibit E, without anyone obtaining a license from Plaintiff or serving Plaintiff with a statutory notice for a compulsory license under 17 U.S.C. § 115.

50.     Defendants have infringed, and are continuing to infringe, Plaintiff's copyright in *Jazz is His Old Lady and My Old Man* by reproducing, distributing, selling, importing, and exporting phonorecords of this musical work including by means of a digital phonorecord delivery as set forth in Exhibit E without anyone obtaining a license from Plaintiff or Ms. Bross or serving Plaintiff or Ms. Bross with a statutory notice for a compulsory license under 17 U.S.C. § 115 and without anyone obtaining authority from Plaintiff or Ms. Bross for exportation as required under 17 U.S.C. § 602.

51.     Defendants have infringed, and are continuing to infringe, Plaintiff's copyright in *It'll Never Be Over For Me* by reproducing, distributing, selling, importing, and exporting phonorecords of this musical work including by means of a digital phonorecord delivery as set forth in Exhibit E without anyone obtaining a license from Plaintiff, Bobrick, Bourne, or Norick, or serving Plaintiff, Bobrick, Bourne, or Norick with a statutory notice for a compulsory license under 17 U.S.C. § 115 and without anyone obtaining authority from Plaintiff, Bobrick, Bourne, or Norick for importation or exportation as required under 17 U.S.C. § 602.

52.     The record labels listed on the Blagman Tracks Chart annexed as Exhibit E have reproduced phonorecords of the Subject Compositions, made them part of albums, and have provided the phonorecords to Orchard and the other aggregators identified in Exhibit E who have, in turn, reproduced and distributed such phonorecords to Apple, Amazon, Google, Microsoft, EMusic, and other digital music sellers. The Defendants all failed to get a mechanical license with respect to each of Plaintiff's musical works embodied on the recordings listed in Exhibit E. The record label names listed in Exhibit A are used on the phonorecords the Retailer Defendants reproduce, distribute, and sell, including by displaying the label names as the record label or copyright owner with the content in the online store catalogs.

53.     No one ever obtained a license, whether by agreement or pursuant to 17 U.S.C. § 115, from Plaintiff or any of his co-owners in the copyrights for any of the Defendants to reproduce, distribute, or sell the phonorecords of Plaintiff's copyrighted compositions *The Prowl*, *Jazz is His Old Lady and My Old Man*, and *It'll Never Be Over For Me* in the manner described above.

54.     No one ever obtained authorization, pursuant to 17 U.S.C. § 602, from Plaintiff or any of his co-owners in the copyrights for any of the Defendants to import or export

phonorecords embodying Plaintiff's copyrighted compositions *The Prowl*, *Jazz is His Old Lady and My Old Man*, and *It'll Never Be Over For Me* in the manner described above.

55.     No one ever obtained authorization from the owners of rights in the recordings listed in Exhibit E to duplicate or distribute them in the manner described above.

56.     Exhibit F annexed to this Third Amended Complaint includes pdf copies obtained from the websites of Apple, Amazon, Google, Microsoft and EMusic showing each Retailer Defendants' U.S. online music store's catalog entries for some of the unlicensed/unauthorized phonorecords embodying the Subject Compositions described above. These catalog entries also list the names of the record label and/or aggregator that supplied the phonorecord embodying Plaintiff's copyrighted musical composition to the Retailer Defendants' U.S. online stores.

57.     Exhibit H annexed to this Third Amended Complaint includes pdf copies obtained from the websites of Apple and Amazon showing each Defendant's foreign online music store's catalog entry for each of the unlicensed/unauthorized phonorecords of the Subject Compositions described above. In many cases, these catalog entries also list the names of the record label and/or aggregator that supplied the phonorecord of the Subject Composition to the Defendants' online stores.

58.     In all of these instances, the Defendants never obtained any license or authorization to reproduce or distribute Plaintiff's musical compositions. These failures are not unique to Plaintiff's compositions. Instead, as explained below, they are indicative of a systematic failure by the Defendants to license, and to ensure that all of the digital music they are reproducing, distributing and selling in their digital music stores is properly licensed.

59.     Apple, Amazon, Google, Microsoft, EMusic, and Orchard are infringing Plaintiff's copyrights in the Subject Compositions under 17 U.S.C. §§ 101, 106, 115, 501, and

602 and, for the reasons set forth below, the infringement is willful in that: (a) Defendants were and are actually aware of the infringing activity, or (b) the Defendants' actions were the result of reckless disregard for, or willful blindness to Plaintiff's rights.

**Mechanical Licenses**

60.     There are two separate and distinct copyrights in every phonorecord of a recorded musical performance – the song, comprised of the underlying music and lyrics (the "song" or the "musical composition") and the sound recording of the performance of that song (the "recording"). The most popular songs in the world are recorded by innumerable artists all over the world. Although each recording of any given song is as unique as the recording artists' voice, instrumentation, accompaniment, equipment and performance, the song (or composition) remains the same. The owner of the copyright in the sound recording is typically referred to as a "record label" while the owner of the copyright in the song is typically referred to as the "music publisher."

61.     Under the Copyright Act, Plaintiff and all owners of the copyrights in non-dramatic musical compositions have the exclusive right to reproduce, distribute, import, and export their copyrighted songs, including by means of digital transmission, and to authorize others to engage in such activity. 17 U.S.C. § 106.

62.     The right to make and distribute[1] phonorecords of a musical work, including by means of a digital phonorecord delivery, can be licensed from the copyright owner of the musical

---

[1] For historical reasons, the right to make and distribute copies or phonorecords of a musical work is known in the music industry as the "mechanical right" and permission to make and distribute copies or phonorecords of a musical work is known as a "mechanical license." These terms derive from the days of player piano, a machine that 'mechanically' reproduced musical works printed on perforated rolls.

work by complying with the provisions of Section 115 (a "compulsory license") or by obtaining a negotiated license.

## *Compulsory Licenses*

63.     Section 115 of the Copyright Act provides that any eligible person who complies with Section 115 and whose primary purpose in making phonorecords is to distribute them to the public, including by means of a digital phonorecord delivery, may obtain a compulsory license to make and distribute phonorecords of a musical work,.

64.     To obtain a compulsory license under Section 115, the prospective licensee must serve a written notice in accordance with the specific requirements of 17 U.S.C. § 115(b) and 37 C.F.R. § 201.18 governing the content, timing, and manner of service.

65.     Specifically 37 C.F.R. § 201.18(d) lists the content required for an effective Section 115 notice, including: (i) the full legal name of the compulsory licensee, together with all fictitious or assumed names used by such person or entity for the purpose of conducting the business of making and distributing phonorecords; (ii) the address and phone number of the compulsory licensee; (iii) name and address of the primary entity expected to be engaged in making and distributing phonorecords under the license (the record company or digital music service); (iv) the fiscal year of the person or entity intending to obtain the compulsory license; (v) For each nondramatic musical work embodied or intended to be embodied in phonorecords made under the compulsory license: (A) The title of the nondramatic musical work; (B) The name of the author(s); (C) A copyright owner of the work; (D) The types of all phonorecord configurations already made and expected to be made; (E) The expected date of initial distribution under the compulsory license; (F) The name of the principal recording artist or group engaged in rendering the performances fixed on phonorecords under the compulsory license; (G)

The catalog number(s) and label name(s) to be used on phonorecords made under the compulsory license; and (H) In the case of phonorecords already made, the date (s) of such manufacture. 37 C.F.R. § 201.18(d).

66.     The notices are required to be specific so that the owners of the copyright in the musical composition can track the use of their works in order to ensure that all recordings of their musical compositions are licensed and authorized, and to ensure they will receive full payment of all royalties due. One of the important pieces of information required in the notice is the "***label name or names, used or expected to be used on phonorecords*** already made (if any) or expected to be made under the compulsory license…" 37 C.F.R. § 201.18(d)(v)(G)(emphasis added).

67.     Notices that fail to include all of the information required by the statute and regulations are defective. Incomplete notices are defective as a matter of law and any reproduction or distribution of phonorecords of musical compositions, including by means of digital phonorecord delivery, for which incomplete or otherwise defective notices were served constitutes an infringement.

68.     In addition to the content of the notice, the statute and regulations prescribe the timing of the service. To be effective, a Section 115 notice must be served on the copyright owner "within thirty days after making, and ***before distributing*** any phonorecords of the work." 17 U.S.C. § 115(b)[1](emphasis added).

69.     The date of initial distribution must be stated in the Section 115 notice. Late notices are defective as a matter of law and any distribution of phonorecords of a musical work, including by means of a digital phonorecord delivery, prior to the serving of the Section 115 notice constitutes copyright infringement.

70.     Section 115 licenses are commonly obtained from the Harry Fox Agency, a collective agent for thousands of music publishers that issues licenses under the provisions of Section 115 but without the requirement of sending the notice and with a variance in the number of annual accountings required under Section 115.

71.     In addition, another method of obtaining a compulsory license was through, the now defunct, Rights Flow (owned by Google), which, for a fee, prepared and served the Section 115 notices for record labels and aggregators or alternatively, would obtain  Section 115 licenses from the Harry Fox Agency as discussed above.

### *Pirated Recordings*

72.     The availability of Section 115 license is further restricted to cases where the recording is lawfully made. The compulsory licensing provisions of Section 115 are not available for phonorecords of musical works embodied on pirated recordings.

73.     Many of the recordings the Retailer Defendants sell in their online music stores on behalf of the record labels listed on Exhibit A are pirated,[2] which precludes a compulsory license under Section 115. It also precludes obtaining a mechanical license from the Harry Fox Agency, which adopts the provisions of Section 115 when issuing mechanical licenses.

74.     Under Section 115, compulsory licenses are not available for pirated recordings and a digital phonorecord delivery of that sound recording is an act of infringement unless such delivery has been authorized by both the copyright owner of the sound recording and the copyright owner of the composition. Specifically, Section 115 provides that:

> A person may not obtain a compulsory license for use of the work in the making of phonorecords duplicating a sound recording fixed by another, unless:

---

[2]  For purposes of this Third Amended Complaint, "pirated" recordings refer to those recordings duplicated by a person or entity without authorization from the owner of the rights in such recordings.

      (i)     such sound recording was fixed lawfully; and

      **(ii)**    **the making of the phonorecords was authorized** by the owner of copyright in the sound recording or, if the sound recording was fixed before February 15, 1972, **by any person who fixed the sound recording pursuant to an express license from the owner of the copyright in the musical work or pursuant to a valid compulsory license for use of such work in a sound recording.**

17 U.S.C. § 115(a)(1) (emphasis added).

     75.    Further, Section 115 further provides that a digital phonorecord delivery of a sound recording constitutes an infringement unless such delivery has been authorized by the owners of the copyrights in ***both*** the recording and the composition:

    (G)(i)  A digital phonorecord delivery of a sound recording is actionable as an act of infringement under section 501, and is fully subject to the remedies provided by sections 502 through 506, unless—

      (I)    the digital phonorecord delivery has been authorized by the copyright owner of the sound recording; and

      (II)   the owner of the copyright in the sound recording or the entity making the digital phonorecord delivery has obtained a compulsory license under this section or has otherwise been authorized by the copyright owner of the musical work to distribute or authorize the distribution, by means of a digital phonorecord delivery, of each musical work embodied in the sound recording.

17 U.S.C. § 115(c)(3)(G).

     76.    Many of the record labels listed on Exhibit A are exclusively used in connection with pirated recordings. For example, Jasmine Records and Sepia (both aggregated by Orchard) exclusively reproduce and distribute phonorecords that duplicate sound recordings that they do not own or have permission to duplicate. Any Section 115 notices or Harry Fox Agency licenses that may have issued for the musical works embodied on these pirated recordings are therefore void and these musical works are unlicensed.

77.     In the absence of mechanical licenses, the publishers and the songwriters do not get paid for the reproduction and distribution of their music. Moreover, reproducing a song without a mechanical license is copyright infringement which may not be cured after the fact by attempting to obtain a compulsory license. Section 115 provides that failure to timely serve a notice of intention to obtain a compulsory license that complies "in form, content, and manner of service" "forecloses the possibility of a compulsory license and in the absence of a negotiated license renders the making and distribution of phonorecords action as acts of infringement." 17 U.S.C § 115(b).

78.     Under the Digital Performance Recording Act of 1995 ("DPRA"), the copyright owner's exclusive right to reproduce and distribute his song, and the compulsory licensing provisions that previously applied to vinyl records, cassettes and CDs, were extended to reproductions and distributions of phonorecords by digital transmission.

79.     The legislative history of the DPRA makes it clear that Congress intended to protect writers and publishers from copyright infringement and to insure that they received their rightful share of revenues earned from their songs:

>       The intention in extending the mechanical compulsory license to digital phonorecord deliveries is to maintain and reaffirm the mechanical right of songwriters and music publishers as new technologies permit phonorecords to be delivered by wire or over the airwaves rather than by the traditional making and distribution of records, cassettes and CD's.

Senate Report No. 104-128, S. Rep. 104-128 (1995) at 26.

>       It confirms the existing "mechanical rights" of writers and publishers (i.e. the right to be paid when compact discs and cassettes embodying their music are distributed) apply to certain distributions [downloads] of phonorecords by digital transmission (referred to in the bill as "digital phonorecord deliveries").

House Report No.104-274, H.R. Rep, 104-274 (1995) at 21.

80.     The legislative history of DPRA also makes it clear that Congress recognized that, ultimately, it was the responsibility of the digital music sellers (such as iTunes) to obtain mechanical licenses for music sold online because a failure to do so would subject them to liability for copyright infringement:

> Thus, the changes to section 115 are designed to minimize the burden on transmission services [such as iTunes] by placing record companies in a position to license not only their own [sound recording] rights, but also, **if they choose to do so**, the rights of writers and music publishers to authorize digital phonorecord deliveries; and by recognizing that transmission services themselves may obtain a compulsory license to make digital phonorecord deliveries.
>
> As between a digital transmission service and a record company, allocation of the responsibility for paying mechanical royalties could be a subject of negotiation, but copyright owners of musical works would only be entitled to receive one mechanical payment for each digital phonorecord royalty, not multiple payments. ***Of course, a digital transmission service would be liable for any infringing digital phonorecord delivery it made in the absence of a compulsory license or the authorization of the musical work copyright owner***.

Senate Report No. 104-128, S. Rep. 104-128 (1995) at 27 (emphasis added).

> If a record company grants a license under its rights in the sound recording only, and does not grant a mechanical license under the copyright in the musical work embodied in the sound recording, ***it is the transmission service's [such as iTunes] responsibility to obtain a license under the musical work copyright***.

Senate Report No. 104-128, S. Rep. 104-128 (1995) at 31.

81.     No one obtained mechanical licenses for the musical compositions that are the subject of this action.

## The Digital Music Business

82.     There are three actors in the digital music business that may obtain a mechanical license: (a) digital music retailers; (b) aggregators; and (c) record labels. They have all failed to obtain mechanical licenses for the musical works the subject of this action.

## The Digital Music Retailers

83.     The Retailer Defendants include four of the most powerful technology companies in the world - Apple, Amazon, Google, and Microsoft. These companies operate digital stores (iTunes, Amazon MP3, Google Play, Zune Marketplace, Xbox Music), operating systems (Android), software and hardware (iPods, iPads, iPhones, Macs, Kindles, Zunes, PCs) with which to purchase and consume music.

84.     The online music stores operated by the Retailer Defendants have many common features, including: (a) the option to purchase digital recordings as individual downloads or as albums; (b) the ability to play samples of the recordings, at no cost, before purchase; and (c) information about the recordings available for sale as downloads displayed with the content, including song title, recording artist, album, and record label and/or copyright owner. The catalog entries for content embodying Plaintiff's compositions annexed as Exhibit F are typical of the Retailer Defendants' online catalog entries for the content they sell.

85.      The Retailer Defendants all generally require their aggregators to provide certain information relating to each phonorecord delivered, including the song title, recording artist, album, record label and/or copyright owner, release date, track length, and various tracking data such as ISRC and UPC numbers (catalog numbers) (collectively, "metadata").

86.     The metadata delivered is generally accepted without alteration by the Retailer Defendants into their databases. The Retailer Defendants display certain metadata fields with the

content in the Retailer Defendants' online music stores as part of the catalog information for each phonorecord offered for sale. The catalog information in the online stores generally includes the name of the releasing record label and/or the owner of the copyright in the recording.

87.     Record labels are trade names used by record companies to market the musical recordings they sell. The term, record label, derives, literally, from the distinctive circular labels that were physically placed on records and companies in the business of selling recorded music came to be known as record labels. All recorded music released legitimately in the U.S. is associated with a record label. By custom and usage in the record industry, the record label name has come to be used to designate and identify the source of recordings.

88.     The Retailer Defendants each display the name of the record label used on the phonorecord in their online store catalogs where it is identified as either the "record label" or the "copyright" owner. For examples of how the label names are used by the various Retailer Defendants to display with the content in their online stores, see the highlighted portions of the catalog entries annexed as Exhibit G.

89.     As discussed above, the importance of the identity of the record label used on the phonorecord is confirmed by the requirement under the Copyright regulations that the releasing record label be identified in any statutory notice sent for a compulsory license in order to allow music publishers to monitor the market place for unlicensed and unauthorized phonorecords embodying their musical compositions. The Retailer Defendants, however, take no steps to monitor or investigate the record labels' phonorecords they reproduce, distribute and sell in their online music stores.

90.     Similarly, the Retailer Defendants take no action in their own right to obtain mechanical licenses for the music they sell in their online stores; nor do they take any steps to confirm that their suppliers have properly obtained mechanical licenses. The Retailer Defendants have publicly conceded that: (a) they "do not require their suppliers to identify the source of their content nor do [they] inquire or investigate as to who those entities are"; and that (b) "[t]hey simply do not have reliable information from which to identify other entities in the chain in order to assess whether or how mechanical rights associated with the relevant content were secured." Dkt. No. 155, p. 9.

91.     As a result of the Retailer Defendants' total indifference to mechanical licensing, they have opened the floodgates to unlawful actors all over the world to sell unlicensed musical works in their online music stores (through any aggregator of their choosing). The Retailer Defendants simply rely on representations in their contracts with aggregators that all music is licensed. The aggregators, in turn, rely on similar representations from the record labels that they distribute to the Retailer Defendants. No one investigates who these labels are or confirms that the musical works they are delivering for sale are properly licensed. As a result, the Retailer Defendants are selling thousands of unlicensed works supplied by unlawful operators all over the world.

92.     There are now innumerable "labels" (including individuals operating as multiple record labels) submitting their recordings to aggregators for sale by the Retailer Defendants. As just explained, these labels can supply any number of phonorecords for sale in the Retailer Defendants' stores at zero cost; the labels have not paid any money to obtain permission from the actual owners the musical works and recordings they are selling, and the Retailer Defendants and

the aggregators typically do not charge the labels any fee until a phonorecord they supplied is sold.

93.     For example, advances in technology have made it relatively easy to duplicate sound recordings embodied on vinyl records produced decades ago. Within a matter of days, anyone with an internet connection can contract ('sign up') with an aggregator, make a digital copy of a vinyl record, upload the recording with corresponding metadata to the aggregator, and have it available for sale in online music stores such as iTunes – all without incurring any cost or obtaining a mechanical license from the owner of the copyright in the musical composition embodied on the recording.

94.     This model has, in less than a decade, upended more than a century of established business practices in the selling of recorded music. As of 2012, digital music sales accounted for more than half of all music purchased in the United States.

95.     The retail digital music revolution did not happen overnight. Over the last ten years, digital music sales increased at a steady doubling pace that masked the growing mass copyright infringement by the Retailer Defendants. The development of the digital music business is best illustrated by the growth of iTunes.

### *iTunes Store*

96.     The iTunes Store is a software-based online digital media store owned by Apple that opened in April 2003. In that year, downloads represented less than 0.1% of all music sold – less than CDs (95%), cassettes (0.9%) and even vinyl singles (0.2%). Starting from almost zero in 2003, the size of the digital music industry nearly doubled each year, so that 0.1% in 2003 turned into a majority of all music sales by 2011.

97.     When the iTunes Store launched in 2003, Apple did deals with the then five major labels (Sony, BMG, Warner, Universal and EMI) and launched with 200,000 recordings available for sale in its store.

98.     By 2010, less than seven years after its launch, Apple announced that the iTunes Store "features the world's largest music catalog with over 12 million songs". Two years later, Apple had added another 14 million tracks, according to its chief financial officer, Peter Oppenheimer, who stated during the company's quarterly earnings call in April, 2012 that iTunes then had over 26 million tracks available for sale.

99.     Apple achieved this dramatic increase in the size of its iTunes catalog by greatly expanding its stable of digital music suppliers. No longer limited to a few major record labels (with fully-staffed and functioning licensing departments), Apple entered agreements with numerous independent "labels" and digital aggregators (such as Orchard) beginning in 2004. Many of these aggregators did not, and still do not, have any staff devoted to licensing musical compositions. They did not spend the time and resources necessary for ensuring that all (or any) of the songs they supplied to online stores such as iTunes were properly licensed.

100.     Today the iTunes Store contains over 26 million tracks originating from thousands of "labels." Apple does not license, or have any staff or procedures in place to ensure that the mechanical rights for the musical works it offers for sale are properly licensed.

101.     Apple's policy of selling everything delivered to it, combined with its refusal to secure mechanical licenses, and electing willful blindness to the infringing status of compositions in its iTunes Store, helped enable Apple to create the largest and most dominant music store in the history of the world within a few years of its opening.

23

102.    As of February, 2013, Apple claimed to have sold over 25 billion downloads through iTunes. Currently, it is estimated that iTunes has more than a 70% share of the digital music market in the United States and it is estimated that over 30% of all music bought in the United States today is purchased from the iTunes Store.

103.    In an effort to keep pace with Apple's dominance in the digital music business, the leading technology companies, with no history in the music business, jumped into the digital music business and copied the iTunes business model of accepting everything delivered to them, securing no mechanical licenses, and willfully ignoring whether musical compositions sold in their online store had been properly licensed from the copyright owner.

### Amazon MP3

104.    Amazon MP3 is a digital music store owned and operated by Amazon that launched in beta in or around September 2007. According to its website, Amazon MP3's catalog now contains over 20 million tracks. Amazon MP3 allows its customers to purchase music from its catalog by digital download, burning a CD, or by storage in the Amazon Cloud. Currently, Amazon MP3 is estimated to have over 15% of the digital music market.

### Google Play

105.    Google Play is a digital music store owned and operated by Google that was originally launched as the "Google music store" within the Android Market in November 2011. According to its website, there are currently over 18 million tracks available on Google Play and Google allows its customers to purchase music from its catalog by digital download or by storage online. Currently, Google Play is estimated to have less than 5% of the digital music market.

### Zune and Xbox Music

24

106.    Zune and Xbox Music are digital music stores owned and operated by Microsoft. Before it was discontinued, Zune had a catalog of over 30 million tracks and Xbox Music's current catalog is over 30 million tracks. Microsoft allows its customers to purchase music from its catalog by digital download or by storage online. Microsoft also offers a music subscription service, which allows subscribers to download an unlimited number of songs for as long as their subscription is active. Currently, Microsoft is estimated to have less than 5% of the digital music market.

### *eMusic*

107.    eMusic.com is a digital music store owned and operated by EMusic that was originally launched in 1998. There are over 17 million tracks available on EMusic which customers may purchase by digital download or through a monthly subscription service that allows its users to download a fixed amount of tracks to their MP3 players per month. Currently, EMusic is estimated to have less than 5% of the digital music market.

### **The Aggregators**

108.    The major record labels – Sony, Warner, and Universal – have direct contracts with the Retailer Defendants. Most other labels go through digital distributors, or "aggregators" to distribute their digital music to the stores. There are a number of aggregators, or distributors, including Orchard, who work with other aggregators and small to large record labels across all genres of music.

109.    Apple, Amazon, Google, Microsoft, and EMusic have accepted and continue to accept, reproduce, distribute and make available for sale all content that the aggregators, including Orchard, supply to them. The aggregators, including Orchard, Believe SAS ("Believe"), Insomnia Ltd. t/a Routenote ("Routenote"), Rants Ltd. t/a VidZone ("Rants"),

Empire Music Distribution ("Empire"), Second Wind Digital ("Second Wind"), Adasam Ltd. ("Adasam"), Isolation Network Inc. ("INgrooves"), and Entertainment One US LP ("eOne") have not obtained mechanical licenses for the musical works that are the subject of this action.

110.    The aggregators, Orchard, Believe, Routenote, Rants, Empire, Second Wind, Adasam, INgrooves and eOne have direct contractual relationships with some, or all, of the Retailer Defendants by which they supply to the Retailer Defendants unlimited amounts of digital music for sale in the respective digital stores that they distribute for record labels.

111.    Some aggregators rely on intermediaries to deliver the recordings to the Retailer Defendants. For example, the aggregator Second Wind, has a direct contractual relationship with some or all of the Retailer Defendants, however, it uses a third party service, FUGA t/a "Independent IP" to deliver the content and the associated metadata it aggregates from record labels to the Retailer Defendants.

112.    The Retailer Defendants do not verify whether any mechanical licenses were obtained for any of the songs, reproduced, distributed or sold in the stores and they do not require aggregators to provide proof of mechanical licenses for any of the music they offer for sale in their online music stores.

113.     As discussed below, aggregators, including Orchard, will supply digital music for sale in the digital music stores regardless of whether the copyrighted composition embodied in the sound recording is licensed.

### *Orchard*

114.    Orchard is an aggregator that reproduces, distributes and supplies content to the Retailer Defendants on behalf of record labels, including record labels' content Orchard acquires from other smaller distributors. For example, Orchard supplies content to the Retailer Defendants

on behalf of the Marmot Music, Jasmine Records and AP Music record labels through its contracts with Shellshock Distribution, Proper Music Distribution Ltd., and Xelon Entertainment Limited, respectively.  Orchard also supplies content to the Retailer Defendants on behalf of the Jazz Musts, Definitive Records, Hoodoo Records, Jazz Factory, Swing Factory, Moon Beams, and Black Coffee Records record labels through its contract with Elemental Music, SLU. Orchard supplies all of the content it receives to the Retailer Defendants.

115.    According to a 2003 press release, Orchard was then the largest supplier of independent music (music not owned by the major record labels) to the iTunes Store.

116.    Upon information and belief, Orchard has agreements with the Retailer Defendants, whereby they permit Orchard, at no cost, to upload all content it aggregates from its labels to the Retailer Defendants' online stores to be made available for sale.

117.    Orchard and the Retailer Defendants each take a commission on the online sales and Orchard pays the balance to the record label or other content provider. The Retailer Defendants' generally receive 30% from the sale of a digital recording and remit the remaining 70% to the Orchard.

118.    Upon information and belief, Orchard has agreements with thousands of record labels, whereby Orchard has the contractual right to distribute the respective record label's content for sale in the Retailer Defendants' online stores. The Orchard generally receives compensation of between 20% and 30% of the net amount remitted by the online store. The Retailer Defendants and their aggregators, therefore, collectively retain approximately half of the sales proceeds for digital recordings (30% to the online store and up to 21% to Orchard or other aggregator).

119.    Orchard admittedly does not obtain the required mechanical licenses for all the

music it distributes. For example, in its 2008-2009 SEC filings, Orchard admitted that it has not

obtained mechanical licenses (or independently confirmed that its clients have done so) for much

of the music it distributes online. Rather, Orchard claimed that it administered mechanical

royalties only to certain artists and labels:

> *We could be liable for unpaid mechanical royalty obligations and bear liability*
> *for copyright infringement if our label clients fail to license and/or pay*
> *mechanical copyright royalties owed or if, where contractually obligated to do*
> *so, we fail to properly license and/or pay mechanical copyright royalties, which*
> *could have a negative effect on our business.*
>
> Mechanical royalties are the statutory or other payment due to the publisher of the
> underlying musical composition embodied in the master recording. We administer
> mechanical royalties for certain artists and record labels. All other artists and
> labels that we distribute represent and warrant to us that they will secure the
> appropriate licenses and pay any royalties due, and agree to indemnify us if they
> do not. We believe this is common practice among digital distributors. As a result,
> in certain instances and under certain circumstances, if the required payments are
> not made, we could be liable for unpaid mechanical royalty obligations and bear
> liability for copyright infringement…

The Orchard Enterprises, Inc., 10-K for 2009 (emphasis in original).

120.    Upon information and belief, Orchard's practices have not changed significantly

or sufficiently since its last SEC filing in 2010 and it has completely failed to properly license

any of the musical compositions that are the subject of this action.

### The Record Labels

121.    The record labels identified in Exhibit A have all failed to obtain mechanical

licenses or any authorization for the copyrighted compositions embodied on content that they are

supplying to the Defendants through aggregators. Among these "bad actor" record labels are

Cleopatra, TVI, the Bennett Labels and the Colley Labels. These labels are only examples of the

unlawful operators supplying the Retailer Defendants with the musical compositions that are the subject of this action.

### Cleopatra and TVI

122.     Cleopatra Records, Inc. ("Cleopatra") is a California record company that sells its music in the Defendants' online stores. Cleopatra is one of the Defendants' top suppliers of digital music which it sells under a number of record label names, including American Made Recordings (AMR), Classic Music International (CMI), Holiday Classic Records (HC), Master Classics Records (MC), Goldenlane (GDR), Goldenlane Records, Rock-A-Billy Records (RBR), Screenland Records (SCRN), Soundtrack Classics, Stardust Records (STRD), and Vintage Masters Inc. (VM). During the relevant period, Cleopatra has made well over 100,000 pre-1972 recordings under these record label names available for sale in the Defendants' online music stores, virtually all of which are pirated.

123.     TVI Records ("TVI") is a Florida record company that sells its music in the online stores under a number of record label names, including Classic Records, Country Music Group, Dobre Classic Media, Dobre Records, Jazz All Stars, Ling Music Group, Serenia Media, and Soul Classics. During the relevant period, TVI has made well over 40,000 pre-1972 recordings under these record label names available for sale in the Defendants' online music stores, virtually all of which are pirated.

124.     Over the years, because of the consolidation in the music industry, many of the record labels that originally released the recordings now being sold by Cleopatra and TVI have been acquired by the three remaining major labels, Sony, UMG, and Warner. Since neither Cleopatra nor TVI originally "fixed" any of the pirated recordings, the only way either could have acquired the rights to sell them would be to purchase or license these recordings. There is,

however, no record of Cleopatra or TVI ever having acquired ownership of these back catalog recordings and none of the major labels has licensed Cleopatra and TVI to sell their recordings in the Defendants' online music stores.

125.    In Cleopatra's case, it is simply digitizing out-of-print vinyl records and selling the digital copies in the Defendants' online music stores. For example, Cleopatra is selling used vinyl records on eBay that were produced and released by other record labels in the 1950s and 1960s. Cleopatra is simultaneously selling digital versions of the same albums in online music stores and crediting itself as the copyright owner of the recordings. Pops, skips and crackles associated with a worn vinyl record can be heard in many of the digital recordings offered by Cleopatra. Exhibit I to this Third Amended Complaint consists of copies of these albums being sold – in digital format – in the Retailer Defendants' online stores.

126.    In addition, Cleopatra is selling many tracks, indeed whole albums, that are identical to those offered for sale in the same online music stores by major labels who actually own the recordings, except that the cover art of the album offered by Cleopatra has been doctored to remove the identity of the original releasing record label. In each instance, Cleopatra's album is lower priced. Exhibit J to this Third Amended Complaint is composed of same examples of side-by-side comparisons of albums being sold by major labels with Cleopatra's pirated versions. The Retailer Defendants do not check or audit their catalogs for duplicative infringing entries.

127.    In addition to licensing fees and recording royalties, Cleopatra and TVI are also required to pay statutory mechanical royalties to the owners of the copyrights in the compositions embodied on the recordings sold. In many cases, however, Cleopatra offers a large

number of recordings for sale at a price that would be insufficient to pay mechanical royalties to the owners of the copyrights in the compositions.

128.    For example, before it was taken down from the online music stores, Cleopatra offered *The Prowl* for sale as part of the album Popcorn - '60s Cool Kids which had 100 tracks. Cleopatra offered the album for sale on Google Pay for $9.49 and on EMusic for $4.40. After paying the online music store and Orchard their share of the sale proceeds, there would not be enough money to pay the mechanical royalties ($.091 per track) to the owners of the copyrights of the compositions on all the tracks. There are many instances where Cleopatra has offered other albums for sale in the online music stores under similar circumstances, i.e., large numbers of tracks on albums sold for such low prices that there simply could not be enough money generated by the sale of an album to pay mechanical royalties. Exhibit K to this Third Amended Complaint is comprised of some examples of albums sold by Cleopatra in the Retailer Defendants' online store that have so many tracks that each sale of a full album would result in a loss for Cleopatra after deducting payments to the stores and aggregators and payment of mechanical royalties.

129.    Cleopatra also offers other pirated material for sale in the Defendants' online music stores, such as radio broadcasts, dramatic readings, comedy, and speeches. For example, Cleopatra is selling many recorded speeches of Dr. Martin Luther King, including his historic speech, *I Have A Dream*, all without authorization from Dr. King's estate. Exhibit L annexed to this Third Amended Complaint is comprised of copies of some of the catalog entries from the Retailer Defendants' online stores for Cleopatra's unauthorized recordings of Dr. King's speeches. While the speeches, radio shows, etc. are not the subject of this lawsuit, they are evidence of the massive scope of Cleopatra's pirate operation.

130.    All of these factors should have made it obvious to Defendants that the Cleopatra and TVI catalogs are comprised substantially of pirated recordings.

131.    Cleopatra and TVI are not the only music bootleggers with substantial numbers of pirated recordings for sale in the Retailer Defendants' online stores. In addition to Cleopatra and TVI, many of the labels listed in Exhibit A are also selling large numbers of pirated recordings.

### The Bennett Labels

132.    Michael Bennett owns several record labels in the UK that are listed on the annexed Exhibit A, including Playbak Records ("Playbak"), Taskmaster, Vantage Point, Tripswitch, and Digilouge Recordings (the "Bennett Labels"). The Bennett Labels' recordings were supplied to the Retailer Defendants by the aggregators, Second Wind, Rants, and INgrooves as reflected on Exhibit A.

133.    The Bennett Labels have made over 75,000 tracks available for sale in the Defendants' online music stores, virtually all of which are either pre-1963 recordings owned by other labels in the U.S. or karaoke recordings. These include: Playbak (4,674 tracks), Taskmaster (9,631 tracks), Vantage Point (14,113 tracks), Tripswitch (12,432 tracks), and Digilouge (35,431 tracks).

134.    One of the Bennett Labels, Vantage Point, made a recording embodying Plaintiff's composition *It'll Never Be Over For Me* available for sale in the Retailer Defendants' online music stores without Plaintiff's authorization or consent.

135.    Like all of the other record labels listed on Exhibit A, the Bennett Labels do not have mechanical licenses or import authorization to reproduce, distribute or sell any digital music in the Defendants' U.S. online music stores.

32

136.     Neither the Retailer Defendants, nor Second Wind, nor INgrooves, nor Rants obtains mechanical licenses nor import authorizations for the musical works embodied on the recordings made available by the Bennett Labels for sale in the Retailer Defendants' online music stores. Nor do they pay any money to the U.S. copyright owner of these musical works.

### *The Colley Labels*

137.     Thomas Colley is a citizen of the United Kingdom and owns several record labels listed on Exhibit A, including Magnitude Records ("Magnitude"), Sixth Right Records ("Sixth Right"), Seventh Right Records ("Seventh Right"), Eighth Right Records ("Eighth Right"), Ninth Right Records ("Ninth Right"), Tenth Right Records ("Tenth Right"), and 13th Right Records ("13th Right")  (collectively, the "Colley Labels").

138.     Virtually all the recordings supplied to the Retailer Defendants on behalf of the Colley Labels are pre-1963 recordings. The Colley Labels have a combined catalog of over 40,000 unlicensed musical compositions in the Defendants' U.S. online music stores: Magnitude (12,215 tracks), Sixth Right (3,694 tracks), Seventh Right (3,696 tracks), Eighth Right (4,475 tracks), Ninth Right (3,625 tracks), Tenth Right (3,695 tracks), and 13th Right ("13th Right")(3,664 tracks).

139.     The recordings on the Colley Labels were supplied to the Retailer Defendants by the aggregators Believe and Routenote, as reflected on Exhibit A.  The Colley Labels do not have mechanical licenses or import authorizations to reproduce, distribute or sell any of the digital music in the Retailer Defendants' online music stores.

140.     Neither the Retailer Defendants, nor Routenote, nor Believe obtain licenses or authorizations for the copyrighted musical works embodied on the recordings that they distribute

33

for any of the Colley Labels, or any other label. Nor do they pay any money to the U.S. copyright owner of these musical works.

**Importation and Exportation**

141.    In addition to obtaining a mechanical license, when retailers or aggregators such as the Defendants wish to acquire from outside the United States a phonorecord embodying a copyrighted composition, Copyright Act Section 602 expressly requires that they obtain authorization from the copyright owner:

> Importation into the United States, without the authority of the owner of copyright under this title, of copies or phonorecords of a work that have been acquired outside the United States is an infringement of the exclusive right to distribute copies or phonorecords under section 106, actionable under section 501.

17 U.S.C. § 602(a)(1).

142.    Under the U.S. Copyright Act, the importation of phonorecords acquired outside of the U.S. requires the express authorization and consent of the copyright owner of the musical compositions embodied on the phonorecords, even if the phonorecords were manufactured lawfully outside of the U.S.

143.    In addition, when a retailer or aggregator such as the Defendants wish to export a phonorecord, Section 602 expressly requires that they obtain authorization from the copyright owner:

> Importation into the United States or exportation from the United States, without the authority of the owner of copyright under this title, of copies or phonorecords, the making of which either constituted an infringement of copyright, or which would have constituted an infringement of copyright if this title had been applicable, is an infringement of the exclusive right to distribute copies or phonorecords under section 106, actionable under sections 501 and 506.

17 U.S.C. § 602(a)(2).

*Unauthorized Importation*

144.     Under the U.S. Copyright Act, therefore, the importation of phonorecords acquired outside the United States into the United States requires the express authorization and consent of the copyright owner of the musical compositions embodied on the copies or phonorecords, even if the copies or phonorecords were manufactured lawfully outside of the U.S. The Defendants, however, do not obtain authorization for importation of copyrighted compositions embodied on phonorecords acquired outside the US. The Defendants are importing thousands of copyrighted compositions owned by Plaintiff and members of the class on phonorecords without authorization.

145.     For example, the Defendants have imported, without authorization from the copyright owners, thousands of copyrighted compositions acquired outside the United States from Orchard, Believe, Routenote, Rants, Empire, Second Wind and Adasam. No one obtained authorization for importation from the copyright owners of the musical compositions embodied on the phonorecords acquired by the Defendants from outside the U.S. that are the subject of this action.

146.     Upon information and belief all of the musical works that are the subject of this action were acquired outside of the U.S. (with the exception of those supplied on behalf of the record labels numbered 66-104 on Exhibit A).

147.     As set forth on Exhibit E, the Defendants have, without Plaintiff's authorization, acquired phonorecords embodying Plaintiff's compositions *It'll Never Be Over For Me* and *Jazz Is His Old Lady & My Old Man* outside of the U.S. These are not isolated instances but are the common result of a systemic failure by the Defendants to obtain authorization for importation under 17 U.S.C. § 602 of phonorecords embodying copyrighted compositions.

***Unauthorized Exportation***

35

148.    In addition to the unauthorized importation of musical works without proper

authorization under 17 U.S.C. § 602, the Defendants are also exporting phonorecords of

copyrighted musical works without the required statutory authorization. Section 602 expressly

requires the Defendants to obtain the authorization of the U.S. copyright owner to export

phonorecords of their musical works outside the US:

> Importation into the United States or exportation from the United States,
> without the authority of the owner of copyright under this title, of copies or
> phonorecords, the making of which either constituted an infringement of
> copyright, or which would have constituted an infringement of copyright if this
> title had been applicable, is an infringement of the exclusive right to distribute
> copies or phonorecords under section 106, actionable under sections 501 and 506.

17 U.S.C. § 602(a)(2).

149.    As noted in Exhibit E, the Defendants have exported numerous phonorecords

embodying Plaintiff's compositions, all without his authorization.

150.    For example, the California-based record label Cleopatra Records, Inc., through

eOne, supplies tens of thousands of pirated recordings to the Defendants for sale exclusively in

the Retailer Defendants' overseas online music stores in territories where the recordings are in

the public domain. Regardless of the law of any other country, the Defendants illegally download

(in the U.S.) pirated copies of the recordings embodying copyrighted musical compositions

supplied by Cleopatra before distributing them for download overseas. The U.S. copyright

owners of the recordings and musical compositions have not authorized the Defendants'

reproduction in the United States.

151.    Cleopatra is not the only U.S. label involved in this systematic infringement by

the Defendants. In addition, the Retailer Defendants are illegally downloading, in the U.S.,

thousands of copyright protected musical compositions and recordings from Orchard on behalf

of CGH Ventures Inc. ("CGH"), a New York corporation. CGH has designated thousands of

musical works for sale "outside the US only" because CGH does not own and did not license any right to make or distribute these recordings from the U.S. copyright owners. The Defendants rely solely on the public domain status of these works in order to sell them in other countries. The principals of CGH, Scott Cohen and Richard Gottherer, are in fact founding members of Orchard.

152.    As with importation, these are not isolated instances but are the common result of a systemic failure by the Defendants to obtain authorization under 17 U.S.C. § 602 to export phonorecords embodying copyrighted compositions.

153.   The Defendants have exported, without authorization from the copyright owners, recordings they received from Orchard on behalf of CGH, and from eOne on behalf of Cleopatra. No one obtained authorization from the relevant copyright owners for the exportation of these phonorecords embodying copyrighted compositions outside the U.S. In many cases the U.S. copyright owners will never be paid anything for overseas sales because they are not members of foreign royalty collection societies; regardless, Defendants have thereby deprived all of the U.S. copyright owners of the musical compositions embodied on the phonorecords of the ability to deny the exportation of the musical works altogether, or to only permit exportation for a negotiated fee acceptable to them.

### Illegal Downloading Prior to Export

154.    In addition, with respect to the process of exportation of digital music, the Defendants infringe the relevant copyrights in several ways. First, the Retailer Defendants make an unauthorized copy of the copyrighted composition upon receipt of the digital recordings from the aggregator, in effect, an illegal download. The Retailer Defendants then make digital

phonorecord deliveries to customers in the UK from the servers in the US, without authorization to export the copyrighted musical work.

155.    The Defendants are engaged in a systematic process of illegally downloading copyright protected compositions and recordings in the U.S. prior to distributing these works in England and other countries where the recordings may be in the public domain. The Defendants illegally downloaded (in the U.S.) pirated copies of the recordings supplied by eOne on behalf of Cleopatra and Orchard on behalf of CGH before distributing these recordings for download overseas. Any reproduction in the United States without license from the U.S. copyright owner is an infringement of the copyright owner's rights under 17 USC § 106(1) ("the owner of the copyright has the exclusive right to . . . reproduce the copyrighted work in copies or phonorecords.").

156.    The willfulness of these infringements is plain. The Defendants solely rely on the public domain status in the UK and other foreign countries and different foreign licensing schemes to exploit these works in other countries. Whatever foreign copyright laws may say, the U.S. Copyright Act governs reproductions within the U.S. and distributions and exportation from the US.

157.    The Defendants have employed a system whereby they infringe U.S. copyright owners' exclusive reproduction right in the U.S. wholly out of sight of the U.S. copyright owners, by downloading digital music from CGH, Cleopatra, and others in the U.S. for reproduction, distribution and sale in foreign countries. The Defendants cannot reproduce copyright compositions without license in the United States and export them, by relying on provisions of a law in another country that makes the work public domain there.

158.    Further, the Defendants' reproductions and distributions of the copyrighted compositions embodied on phonorecords designated for sale exclusively in foreign countries renders them ineligible for mechanical licenses which are only available to those whose primary purpose is to make and distribute phonorecords in the U.S. 17 U.S.C. § 115(a).

### Class Allegations

159.    In addition to infringing Plaintiff's copyrights in the Subject Compositions, the Defendants have also willfully infringed thousands of other copyrighted compositions in the same manner and continue to do so.

160.    Plaintiff brings this action on behalf of himself, and all others similarly situated, pursuant to FRCP Rules 23(a), 23(b)(2), and 23(b)(3), specifically on behalf of the legal and/or beneficial owners of all or part of at least one musical composition registered with the U.S. Copyright Office prior to January 1, 1998 and embodied on a phonorecord that was reproduced, distributed, sold, imported, or exported by at least one of the Retailer Defendants during the Class Period and that was supplied to the Retailer Defendant, directly or through one or more intermediaries, by one of the aggregators listed on the Aggregator-Label List annexed as Exhibit A on behalf of a corresponding record label listed on Exhibit A.

161.    The members of the Class are so numerous that joinder of all members is impracticable. Due to the nature of the commerce involved, the members of each Class are geographically dispersed throughout the United States. While the exact number of Class members can only be determined based on information in the sole possession, custody and control of the Defendants, Plaintiff believes that there are perhaps thousands or more members of the Class.

162.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among questions of law and fact common to the Class are:

a.      whether the Defendants reproduced, distributed, and/or sold digital phonorecords embodying copyrighted musical compositions owned or controlled by members of the Class for the Defendants' own commercial purposes;

b.      whether the Defendants properly licensed the copyrighted musical compositions owned or controlled by members of the Class as embodied in the digital phonorecords available for sale in the Defendants' online music stores;

c.      whether the Defendants timely licensed the copyrighted musical compositions owned or controlled by members of the Class as embodied in the digital phonorecords available for sale in the Defendants' online music stores;

d.      whether the Defendants obtained authorization from members of the Class to import or export the copyrighted musical compositions owned or controlled by members of the Class as embodied in digital phonorecords available for sale in the Defendants' online music stores;

e.      whether the Defendants' reproduction, distribution, sale, importation or exportation of the copyrighted musical compositions owned or controlled by members of the Class as embodied in digital phonorecords made available for sale in the Defendants' online music stores constitute copyright infringement;

f.      whether such copyright infringement was willful or innocent;

g.      whether the Class has suffered damages as a result of the Defendants' actions; and

h.      whether injunctive and/or declaratory relief is appropriate.

163.    Plaintiff's claims are typical of the claims of the other members of the Class he seeks to represent. Defendants' illegal practices have targeted and affected all members of the Class in a similar manner, *i.e.*, they have all sustained damages arising out of Defendants' willful conduct in violation of the Copyright Act.

164.    Plaintiff will fully and adequately protect the interests of all members of the Class. Plaintiff has retained counsel experienced in both complex class action and copyright infringement litigation. Plaintiff has no interests which are adverse to or in conflict with other members of the Class.

165.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable. The prosecution of separate actions by individual members of the class would impose heavy burdens upon the courts, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

166.    The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. The damages suffered by the individual Class members may be relatively small; and therefore, the expense and burden of individual litigation make it virtually impossible for class members to redress the wrongs done to them. Plaintiff anticipates no difficulty in the management of this action as a class action.

## COUNT I

### (Copyright Infringement – 17 U.S.C. § 101 et seq.)

167.    Plaintiff re-alleges and incorporates by reference all of the allegations of this Third Amended Complaint with the same force and affect as if fully restated herein.

168.    Defendants have and are reproducing, distributing, selling, exporting and importing copyrighted musical compositions owned by Plaintiff, and by the Class as identified in herein, without anyone obtaining mechanical licenses for the musical compositions and/or without authorization from the copyright owner as required by 17 U.S.C. § 602.

169.    By reason of the conduct described above, Defendants are directly liable for copyright infringement. Each violation of each of Plaintiff's and the Class's rights in and to each musical composition constitutes a separate and distinct act of copyright infringement.

170.    By their conduct described above, Defendants have infringed and are continuing to infringe copyrights of Plaintiff and the Class on a daily basis. 17 U.S.C. §§ 101, 106, 115, 501, 602 et seq.

171.    Defendants' copyright infringement has caused substantial damage to Plaintiff and to the Class. As a direct and proximate result of Defendants' infringement, Plaintiff and the Class are entitled to the minimum statutory damages under 17 U.S.C. § 504(c) of $750 for each act of non-innocent infringement.

172.    Defendants' infringement is and has been willful, intentional, purposeful and willful disregard of the rights of Plaintiff and the Class.

173.    Plaintiff and the Class are entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

174.     Unless enjoined by this Court, Defendants will continue to cause Plaintiff and the Class irreparable injury that cannot be fully compensated or measured in money. Plaintiff and the Class have no adequate remedy at law. Pursuant to 17 U.S.C. § 502, Plaintiff and the Class are entitled to a permanent injunction prohibiting Defendants from reproducing, distributing, and selling their copyrighted musical works without license or authorization in violation of the Copyright Act.

## **Demand for Jury Trial**

175.     Pursuant to Federal Rule of Civil Procedure 38(b), and otherwise, Plaintiff and the Class respectfully demand a trial by jury on all issues.

**<u>Prayer for Relief</u>**

WHEREFORE, Plaintiff respectfully requests that judgment be entered against

Defendants as follows:

1.      An order certifying this case as a class action and appointing Plaintiff and his counsel to represent the Class;

2.      A declaration that Defendants have infringed Plaintiff's and the Class's copyrighted works in violation of the Copyright Act;

3.      A declaration that each of Defendants' infringements was willful;

4.      An award of statutory damages of $750 for each infringement of a copyrighted work owned by Plaintiff and/or a member of the Class;

5.      A permanent injunction barring the Defendants from continued infringement of the copyrights of Plaintiff and Class members pursuant to 17 U.S.C. § 502; and

6.      Reasonable attorney's fees and costs of this action, statutory pre-judgment interest, and such other relief as this Court may deem just and proper.

Dated: New York, New York
        April 22, 2015

        SCHWARTZ & PONTERIO, PLLC

        _____
        Matthew F. Schwartz
        Brian S. Levenson
        134 West 29th Street, Suite 1006
        New York, New York 10001
        Telephone: (212) 714-1200

        GISKAN SOLOTAROFF                    BONI & ZACK LLC
        ANDERSON & STEWART LLP               Michael J. Boni
        Oren S. Giskan                       Joshua D. Snyder
        Jason L. Solotaroff                  John E. Sindoni
        11 Broadway - Suite 2150             15 St. Asaphs Road
        New York, New York 10004             Bala Cynwyd, Pennsylvania 19004
        Telephone: (212) 847-8315            Telephone: (610) 822-0202

        *Attorneys for Plaintiff and the Proposed Class*